HALE *v.* SOVEREIGN CAMP WOODMEN OF THE WORLD.

*(Knoxville.* September Term, 1920.)

1. **PRINCIPAL AND AGENT.** Agent's knowledge as to material fact imputable to principal.

The knowledge of an agent as to a material fact bearing upon a contract which he is employed to solicit or negotiate on behalf of his principal is imputable to the principal. (*Post, pp.* 561, 562.)

Cases cited and approved: Insurance Co. v. Sorrels, 60 Tenn., 352; Insurance Co. v. Hancock, 106 Tenn., 513; Insurance Co. v. Whitaker, 112 Tenn., 151; Insurance Co., v. Fallow, 110 Tenn., 720; Knights of Pythias v. Cogbill, 99 Tenn., 28.

Case cited and distinguished: Bennett v. Mass. Mutual Life Ins. Co., 107 Tenn., 371.

2. **INSURANCE.** Insurer estopped from relying on false report of its physician.

Where applicant truthfully answers the questions propounded to him by insurer's physician and the physician inserts false statements in the blank furnished him and makes a false report to the insurer, and a policy is issued, the insurer is estopped from relying on such false report, to defeat action on the policy, since the physician's knowledge of the truth will be imputed to the insurer. (*Post, pp.* 563-566.)

3. **INSURANCE.** Insurer estopped from relying on falsity of representation of bogus application.

Where bogus application was sent in through negligence of the insurer's agents without any fault of applicant, insurer is estopped from relying on falsity of statements in application, in action on policy; the negligence of the agents being imputable to the insurer, (*Post, pp.* 566-568.)

Case cited and approved. Insurance Co. v. Whitaker, 112 Tenn., 151.

4. INSURANCE. Fraternal benefit society may waive contract provisions notwithstanding local camp officers are precluded from so doing.

A fraternal benefit society may waive the provisions of its contract with a member, notwithstanding by-laws and provisions of contract denying to a local camp or the officers thereof the power to waive provisions of contrarct. (*Post, pp.* 568, 569.)

Cases cited and approved: Foresters v. Cunningham, 127 Tenn., 521; Simmons v. Sovereign Camp W. O. W., 136 Tenn., 233.

5. INSURANCE. Misrepresentations as to matters not contributing to insurer's death held not to defeat action on certificate.

Representation that applicant had not consulted a physician during the preceding five years *held* insufficient to defeat action on benefit certificate though during such time he had summoned a doctor during an attack of asthma from which he promptly recovered, and though during such time he had procured a prescription from a doctor to reduce his flesh at a time when he was not sick, where death was caused by influenza, since representations were as to matters which in no way constituted either directly or indirectly to his death. (*Post, pp.* 569, 570.)

Cases cited and approved. Rand v. Life Assurance Society, 97 Tenn., 291; Insurance Co. v. Lauderdale, 94 Tenn., 642; K. of P. v. Rosenfeld, 92 Tenn., 508; Insurance Co. v. Wilkinson, 13 Wall., 230, 231; Conn. Mut. Life Ins. Co. v. Union Trust Co., 112 U. S., 250; Knights of Pythias v. Cogbill, 99 Tenn., 28; Rand v. Life Ins. Society, 97 Tenn., 291.

FROM HAMBLEN.

Appeal from the Chancery Court of Hamblen County.— HON. SAM JOHNSON, Chancellor.

E. R. TAYLOR and W. N. HICKEY, for appellant.

JOHN R. KING, for appellees.

MR. JUSTICE GREEN delivered the opinion of the Court.

This suit was brought to recover on a benefit certificate, and there was a decree for the complainant below from which the defendant has appealed to this court. The benefit certificate was issued February 13, 1917, on the life of Clyde C. Hale by defendant society and was payable to the complainant, the brother of the assured. The suit is defended on the ground that the application upon which the certificate was issued contained false and fraudulent statements, and under the contract between the parties these statements were made warranties and the certificate was based thereon.

The case presents some peculiar features.

The deceased, Clyde C. Hale, was a farmer and stock dealer residing near Morristown, Tenn., and was forty-four years of age at the time of his death in October, 1918. He was a well-known man in this community and conspicuous by reason of his unusually large size. He was more than six feet tall and weighed about three hundred and forty pounds. All the proof shows that he was a man of the highest character. We have seldom had a record before us containing higher testimonials to the honor and integrity of anyone.

The defendant is a well-known fraternal benefit society, its organization embracing an insurance department for

the protection of the dependents and relatives of its members.

The deceased was elected to membership January 27, 1917, and made application for insurance. He was supplied with a printed form of application. This application consists of four pages, being like a sheet of note paper or foolscap paper folded crosswise. On the first page is an application containing some statements intended to be signed by the applicant, by those recommending him for membership, and by the clerk of the local lodge or camp as it is called. The second page consists of questions, to be answered by the applicant to be recorded by the medical examiner referring to the family history of the applicant and the previous health of such applicant. The first page and the second page are both intended to be signed by the applicant.

The third page contains blanks to be filled out by the medical examiner referring to the physical condition of the applicant. This page is intended to be signed by the physician alone.

The fourth page, which is the outside of the document when folded, contains nothing of particular importance in this inquiry.

The application upon which the sovereign camp of defendant society issued the benefit certificate in suit is filed with the record. There is no controversy about the first page thereof and that it was signed by Clyde C. Hale, the deceased. The statements thereof all appear to be true and uncontroverted. On the second page of the applica-

tion filed herein, the applicant appears to have answered that he had not consulted or been attended by a physician for any disease or injury during the past five years. He also appears to have answered that he had never failed to obtain life insurance for which application had been made. It is conceded that both of these statements are untrue.

In the physician's report on the third page, the applicant's weight is stated to be two hundred and forty pounds. As heretofore noted, his weight was in reality 340 pounds. Likewise on this page false statements are made with reference to the circumference of the applicant's chest and abdomen.

It is undisputed on this record that the signature of Clyde C. Hale on the second page of the application is a forgery, and that the signatures of C. T. Carroll, Jr.. the medical examiner, on the third page, as well as on the second page, are forgeries. Both these pages are expected to be filled out by the medical examiner, and Dr. Carroll testifies that he did not fill out either page of the application filed herewith. It seems from the deposition of F. E. D. Clark, the clerk of the local camp, that the deceased was solicited to become a member of the defendant society by one E. C. Riggs, who belonged to the local camp and was active in procuring new members for such camp as well as for another fraternal society with a lodge at Morristown. Clark says that after deceased was elected to membership and the first page of the application herein was filled out and signed by deceased, that he (Clark) turned the application over to Riggs with instructions to the

latter to take it to Dr. Carroll and to have deceased examined. Clark says that a few days thereafter Riggs returned the application to him, and that he put it in an envelope without giving it any particular examination and mailed it to the sovereign camp of the order at Omaha, Neb. Riggs denies that he took the application to Dr. Carroll, and denies that he brought it back to Dr. Carroll to Clark. Dr. Carroll first testified that Clark brought him the application, and that he returned it to Clark; but upon cross-examintion he is not clear as to how the application came into his hands and as to whom he returned it.

Dr. Carroll, however, is clear in his testimony as to the examination of the deceased conducted by him. He says that deceased answered that previous applications of his for life insurance had been rejected and that his answer was truthfully recorded on the application before him. Dr. Carroll likewise states that he duly measured and weighed the deceased when examining him, and that the true weights and measurements were recorded on the application before him. The weighing of deceased was fixed on Dr. Carroll's memory by the fact that the doctor's office scales were too small, and he had to take the deceased out of his office, where the examination was made, to a hardware store and weigh him on heavier scales.

The testimony of Dr. Carroll shows that the second and third pages of the application before him were truthfully filled out in the particulars noted above, and signed by the doctor and by the deceased in the doctor's presence.

Dr. Carroll paid no particular attention to the first page of the application that was turned over to him, merely glancing at it to see whether it had been filled out, and this apparently had been properly done.

It would seem from the foregoing that the application which was furnished Dr. Carroll was a *bogus* application with the first page forged, and that he and the deceased filled out and signed the second and third pages of this *bogus* application. The application of which the first page was genuine, and in reality filled out and signed by deceased and others, seems not to have been taken to Dr. Carroll, but held out by some one, the second and third pages thereof filled out by some one other than Dr. Carroll, the signatures of Dr. Carroll and deceased forged thereto, and this application forwarded to the sovereign camp.

Both parties accredit Dr. Carroll to the court and disclaim any intimation that he was guilty of fraud in this matter.

The general officers at the sovereign camp, including the sovereign medical examiner, acted on the assumption that the application sent to them was in all respects genuine and the benefit certificate issued on the faith thereof. Under these circumstances, what are the rights of the parties?

It is a familiar rule of law that the knowledge of an agent as to a material fact bearing upon a contract which he is employed to solicit or negotiate on behalf of his principal is imputable to the principal, and this rule is

143 Tenn.—36

of frequent application to insurance contracts. *Insurance Co.* v. *Sorrels,* 60 Tenn. (1 Baxt.), 352, 25 Am. Rep., 780; *Insurance Co.* v. *Hancock,* 106 Tenn., 513, 62 S. W., 145, 52 L. R. A., 665; *Insurance Co.* v. *Whitaker,* 112 Tenn., 151, 79 S. W., 119, 64 L. R. A., 451, 105 Am. St. Rep., 916; *Insurance Co.* v. *Fallow,* 110 Tenn., 720, 77 S. W., 937.

In *Bennett* v. *Massachusetts Mutual Life Insurance Co.,* 107 Tenn., 371, 64 S. W., 758, it is said, quoting Mr. Joyce:

"A medical examiner is an agent with limited powers, but, nevertheless, his acts in and about the business entrusted to his care are binding within the scope of his authority, and, to this extent, the general rules of agency are applicable to him as to other special agents."

In *Knights of Pythias* v. *Cogbill,* 99 Tenn., 28, 41 S. W. 340, the knowledge of the local medical examiner of a fraternal benefit society was held to be imputable to the society in a case where the true facts concerning the physical condition were stated to the local examiner, and the examiner inserted false statements in the report of his examination made to the society. In this case it was held to be immaterial that the application recited that the local physician should be treated as the agent of the applicant.

While there is some authority to the contrary, the rule above stated, as to the knowledge of a local physician being the knowedge of his principal, the assurer, is almost everywhere accepted. Joyce on Insurance (2d Ed.), sections 2721, 474a; Cooley's Briefs on Insurance, vol. 3, pp. 2552, 2561; note 107 Am. St. Rep. 108.

Under these authorities, where the applicant for insurance truthfully answers the questions propounded to him by the local physician of an insurance company or a fraternal benefit society issuing insurance, and the physician inserts false statements in the blank furnished him and makes a false report to his principal, and a policy issues, the assurer is held to be estopped from relying on such false report. This is for the reason that the agent of the assurer employed to procure this information was truthfully advised by the assured. Such knowledge having been acquired by the special agent in the execution of the special authority he possessed, this knowledge will be ascribed to the principal. The principal therefore, having knowledge of the truth, will not be permitted to rely on the fraud of its agent for which the assured was in no way responsible.

In the case before us, if it appeared that Dr. Carroll was responsible for the false answers contained in the report of the examination of deceased, under our decisions it would follow necessarily, nothing else appearing, that defendant here would be estopped from resisting this demand.

It does not appear, however, from this record, who is responsible for the *bogus* application forwarded to the sovereign camp of defendant society. Dr. Carroll testifies that he wrote out a truthful report of the facts disclosed by the examination of deceased, and that he truthfully recorded the answers made in this examination by the

deceased. Clark, the local clerk, says that he had nothing
to do with the preparation of the second and third pages
of the application before us and that he mailed the appli-
cation to the sovereign camp just as it was returned to
him by Riggs and without any alteration. Riggs denies
that he had anything to do with the preparation of this
application at all, and as heretofore noted, denies that he
took it to Dr. Carroll or returned it to Clark. All these
parties were introduced as the complainant's witnesses.
The deposition of Riggs was taken by defendant, but not
used by it, and the complainant read this deposition.

The proof shows that the only apparent benefit that ac-
crued to any of these local men by reason of the acceptance
of deceased's application was the fee of $1 coming to Riggs
for obtaining deceased as a member of the camp and per-
haps a similar fee to Clark. It is urged by defendant that
neither of these men would have undertaken such a haz-
ardous thing as the forging of this document for the sum
of $1, leaving everything else out of consideration.

The defendant insists that the only party benefited by
this fraud was the deceased or his brother. It is argued
that the proof acquits the local agents of the defendant
of wrongdoing, and that, deceased being the beneficiary
thereof, we should presume that he was responsible for
the fraud. There is nothing, however, to indicate that de-
ceased had anything whatever to do with the fraud per-
petrated. The record shows that he was a man worth be-
tween $50,000 and $60,000. He and his brother were part-

ners—the brother being the beneficiary of the policy—and the brother was worth something more than deceased.

We have heretofore spoken of the high character which the record shows deceased to have had. An agent of one of the insurance companies by which the deceased was formerly rejected proved that deceased was very careful in his statements about his physical condition, and was particular to see that his application for insurance contained nothing but the truth. We cannot, therefore, presume that a man of the character of deceased to whom this small policy would mean little, and would mean less to his beneficiary, would undertake such fraud in the absence of any circumstances hinting at such participation.

The deceased does not appear to have been particularly anxious to obtain insurance, the asseverations of defendant to the contrary notwithstanding. He seems to have been solicited for insurance several times and to have been interested in obtaining insurance, but there is nothing on the record tending to show that he would have gone to any extraordinary lengths to obtain insurance.

Under the by-laws of the defendant society, it was the duty of the clerk of the local camp to attend to all the correspondence of the camp. According to the proof, it seems that it was the duty of such clerk to forward to the sovereign camp applications along with a remittance from the applicant.

In the case before us the clerk of the local camp negligently sent on a *bogus* application. It may be that the local physician negligently furnished to the clerk a *bogus*

application. If therefore we acquit the local agents of all actual fraud in framing up the *bogus* application, the fact remains that they were guilty of negligence in the duties specially committed to their care by the rules and regulations of defendant.

The deceased had nothing to do and was not concerned with the forwarding of this application after he signed it.

We see no difference in the application of the rule of law heretofore discussed in a case where the local agents have been guilty of negligence and in a case where they have been guilty of actual fraud. The basis of the liability of the assurer in such cases is the knowledge of the special agent acquired within the particular line of his duties with which knowledge the principal is charged. It can make no difference whether the general officers of the assurer are misled inadvertently or intentionally by the local agent. 3 Cooley's Briefs on Insurance, p. 2555.

The defendant relies on statements contained on the first page of the application, duly signed by the deceased, to the effect that the application "consisting of two pages, to each of which I have attached my signature, the examining physician's report and all the provisions of the constitution and laws of the society, now in force or that may hereafter be adopted, shall constitute the basis for and form a part of any beneficiary certificate that may be issued;" and another statement to the effect that—

"I hereby certify, agree and warrant that all the statements, representations and answers in this application

consisting of two pages as aforesaid are full, complete and true whether written by my own hand or not."

It is insisted that by the foregoing the deceased undertook to warrant that everything thereafter to be placed on the application was true, and that he was accordingly bound by all statements thereafter included.

We do not agree to this. Dr. Carroll thought he was filling the genuine application of the deceased, and truthfully recorded the answers of deceased on the application, the second page of which the deceased signed. Dr. Carroll was deceived and he misled the deceased. It was Dr. Carroll's business to procure the signature of deceased to the second page of the application, and the deceased was entitled to believe that the application in the medical examiner's hands, tendered to deceased for signature, was *bona fide.* The defendant cannot in good conscience rely on a mistake of the deceased induced by its own agent within the scope of his authority. There are numerous cases in the books where the deceased has been held not bound by false statements contained in an application which he signed prior to its completion, and which application was filled out with fraudulent matter thereafter by the local agent of the assurer. 3 Cooley's Briefs on Insurance, p. 2572. See, also, *Insurance Co.* v. *Whitaker,* 112 Tenn., 1151, 79 S. W., 119; 64 L. R. A., 451, 105 Am. St. Rep., 916.

The defendant refers to several clauses in its by-laws and in the application and benefit certificate providing

that the certificate is issued on the faith of the application, and that all statements in the application shall be treated as warranties, and denying any power to the local camp or the officers thereof to waive any provision of the contract.

Notwithstanding all such provisions, it was still within the power of the sovereign camp of defendant society to waive the provisions of its contract with the assured that are relied upon. Such a waiver could be accomplished, regardless of the nature of the organization of defendant, by its duly constituted authorities. This was decided after full consideration by this court in the case of *Foresters* v. *Cunningham,* 127 Tenn., 521, 156 S. W., 192, 5 A. L. R., 1569.

There is no question here of an attempt to waive any provision of the contract by a subordinate lodge or any officer thereof. The certificate was issued in regular form by the sovereign camp of the defendant. At the time of the issuance of this certificate the society itself was charged by the law with knowledge of the truthful answers by the deceased in his medical examination conducted by the agent of the society especially designated for that purpose. Notwithstanding such knowledge, the benefit certificate issued and an estoppel or waiver, under our authorities, must be held to arise.

The case of *Simmons* v. *Sovereign Camp W. O. W.,* 136 Tenn., 233, 188 S. W., 941, is not in point at all. There was an effort there to predicate an estoppel or waiver on the acts of one of defendant's local camps.

In the medical examination conducted by Dr. Carroll, it seems that the deceased replied in the negative to a question as to whether he had consulted or been attended by a physician for any disease or injury during the past five years. The *bogus* application likewise represents deceased as so answering this question. It is contended that this is a false statement which will defeat the defendant's claim.

As a matter of fact, the deceased contracted a bad cold at one period during the five years preceding and had an attack of asthma in connection with it and summoned a doctor. The doctor testified that this attack amounted to nothing and that deceased promptly recovered from it. The attack had no connection with the death of the deceased. He died from influenza during the epidemic of 1918.

It also appears in the record that deceased had procured a prescription from a doctor to reduce his flesh on one occasion, and had also taken a trip to Battle Creek for this purpose. It does not appear, however, that deceased was sick when he procured this last prescription or when he went to Battle Creek.

It is likely that deceased overlooked these matters in his medical examination. At any rate, they were trifling things and in no way contributed to his death. We think that his answer, ignoring these things, does not affect the liability of the assurer.

"The mere omission of an applicant to mention a disease which does not, directly or indirectly, cause his death,

can but be an immaterial matter in an action for the insurance. Such an omission does not affect the risk, and cannot be properly characterized as a fraudulent concealment. It is not every slight or temporary illness, and especially when not specifically inquired about, that must be revealed. Only those attacks which have, in some degree, a detrimental influence upon the general health or constitution of the applicant are material to the risk, and therefore within the rule as to warranties. *Rand* v. *Life Assurance Society,* 97 Tenn., 291; *Insurance Co.* v. *Lauderdale,* 94 Tenn., 642; *K. of P.* v. *Rosenfeld,* 92 Tenn., 508; *Insurance Co.* v. *Wilkinson,* 13 Wall., 230, 231; *Conn. Mut. Life Ins. Co.* v. *Union Trust Co.,* 112 U. S., 250; 1 Bacon on Life Ins., section 234." *Knights of Pythias* v. *Cogbill,* 99 Tenn., 28, 41 S. W., 340.

See, also, *Rand* v. *Life Insurance Society,* 97 Tenn., 291, 37 S. W., 7.

Some other questions are made in the case which do not require discussion.

Upon full consideration we conclude that there was no error in the decree of the chancellor, and it is, accordingly, affirmed.